IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| JUST TACOS, INC.; and RESOL HAWAII, LLC, | ) ) ) | CV. NO. 11-00663 DAE-KSC |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| MICHAEL ZEZULAK; JUST TACOS PEARL CITY, INC.; and JUST TACOS HAWAII KAI, INC., | ) ) ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

ORDER GRANTING IN PART AND DENYING IN PART WITHOUT
PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

On December 8, 2011, the Court heard Plaintiffs' Motion for

Preliminary Injunction.  Milton M. Yasunaga, Esq., appeared at the hearing on

behalf of Plaintiffs; Philip A. Davis, Esq., appeared at the hearing on behalf of

Defendants.  After reviewing the motion and the supporting and opposing

memoranda, the Court **GRANTS IN PART** and **DENIES IN PART WITHOUT**

**PREJUDICE** Plaintiffs' Motion for Preliminary Injunction. (Doc. # 2.)

BACKGROUND

The instant action arises from a dispute between Plaintiffs Just Tacos,

Inc. and Resol Hawaii, LLC, franchisors and owners of the Just Tacos brand, and

Defendants Just Tacos Pearl City, Inc. and Just Tacos Hawaii Kai, Inc., former corporate franchisees, as well as Defendant Michael Zezulak, the proprietor of those franchisees.

In 2005, Jesus Santoyo opened a take-out Mexican restaurant in downtown Honolulu named "Just Tacos Mexican Grill."  ("Santoyo Decl.," Doc. # 2-2 ¶ 2.)  The business was incorporated as "Just Tacos, Inc." ("JTI").  (Id.)  On June 13, 2007, JTI registered the trade name "Just Tacos Mexican Grill & Cantina" with the State of Hawaii.  (Id.; Doc. # 2-5.)  Defendant Resol Hawaii, LLC ("Resol"), a company formed by Santoyo to hold his intellectual property, has filed applications for federal registrations for "Just Tacos Mexican Grill & Cantina" and "Just Tacos."  (Id. ¶ 9.) Those applications are still pending.  (Id.) Santoyo later opened a Just Tacos Mexican Grill & Cantina in Mililani in 2007 and in Ko Olina in 2009.  (Santoyo Decl. ¶ 2, 15.)

In 2007, Santoyo began creating a Just Tacos in Pearl City.  (Id. ¶ 10.) Since the Pearl City location was smaller, it was planned as a Grill, not a Cantina. (Id.)  In 2008, Santoyo was introduced to Defendant Michael Zezulak, who was looking for an investment opportunity in Hawaii.  (Id. ¶ 11.)  Zezulak agreed to pay for the construction of the Pearl City Just Tacos Grill and it was agreed that it would be his restaurant.  (Id. ¶ 12.)  Zezulak also agreed to pay monthly fees to JTI

in exchange for the use of the Just Tacos name, trade secrets, and procedures as well as the Just Tacos plan of organization and operation.  (Id.; Doc # 2-4.)  In March 2008, Santoyo and Zezulak signed a written Franchise Agreement ("Agreement"), which was prepared by Zezulak's attorney.  (Santoyo Decl. ¶ 13; see "Agreement," Doc. # 2-4.)  That Agreement contains the following relevant provisions:

**5. FEES**

b.     At all times after the commencement of operation by Franchise Owner, Franchise Owner shall pay to Franchisor the following recurring fees:
i.     A continuing fee equal to three percent (3.00%) of the Total Sales . . . per month no later than the 15th of the month . . . .

**6. LICENSED MARKS**

a.     Franchise Owner expressly acknowledges Franchisor's rights in and to the Licensed Marks . . . .

b.     Franchise Owner understands and agrees that any use of the Licensed Marks other than as expressly authorized by this Agreement, without Franchisor's prior written consent, may constitute an infringement of Franchisor's rights therein and that the right to use the Licensed Marks granted herein does not extend beyond the termination or expiration of this Agreement.

**7. STANDARDS OF OPERATION**

Franchise Owner shall maintain standards of quality, appearance and operation for the Franchised Business.  For the purpose of giving

distinctiveness to the Licensed Marks, enhancing the public image and reputation of businesses operating under the Just Tacos System and for the purpose of increasing the demand for services and products provided by franchise owners and Franchisor, the Franchise Owner agrees to operate the Unit in strict conformity with Franchisor's standards and all rules, regulations and policies.

## 8. CONFIDENTIAL OPERATING MANUAL

a.      In order to protect the reputation and goodwill of the businesses operating under the Just Tacos System and to maintain standards of operation under the Licensed Marks, Franchise Owner shall conduct the Franchised Business operated under the Just Tacos System in accordance with various written instructions and confidential manuals . . . , all of which Franchise Owner acknowledges belong solely to Franchisor and shall be on loan from Franchisor during the term of this Agreement.

## 11. COVENANTS

. . .

b.      In the event this Agreement is terminated, expires, or is not renewed, . . . Franchise Owner must remove all signage and trade marked materials relating to the Just Tacos Franchise.

c.      In the event of any termination, expiration or non-renewal of this Agreement, Franchise Owner agrees that it will never use Franchisor's confidential information, trade secrets, methods of operation or any proprietary components of the Just Tacos System in the design, development or operation of any business.

## 14. POST TERM OBLIGATIONS

Upon the expiration of this Agreement, Franchise Owner shall immediately:

a.      Cease to be a franchise owner of Franchisor under this
        Agreement and cease to operate the former franchised business
        under the Just Tacos System.  Franchise Owner shall not
        thereafter, directly or indirectly, represent to the public that the
        former franchised business is or was operated or in any way
        connected with the Just Tacos System or hold itself out as a
        present or former franchise owner of Franchisor at or with
        respect to the Premises;

b.      Pay all sums owing to Franchisor, including those invoiced to
        Franchise Owner after this Agreement expires or is
        terminated. . . .

c.      Return to Franchisor the Confidential Operating Manual and all
        trade secret and other confidential materials, equipment and
        other property owned by Franchisor, and all copies thereof. . . .

d.      Take such action as may be required by Franchisor to transfer
        and assign to Franchisor or its designee or to remove any
        connection to the Just Tacos System from all telephone
        numbers, white and yellow page telephone references and
        advertisements, and all trade and similar name registrations and
        business licenses, and to cancel any interest which Franchise
        Owner may have in the same; and

e.      Cease to use . . . any methods, procedures or techniques
        associated with the Just Tacos System in which Franchisor has
        a proprietary right, title or interest; cease to use the Licensed
        Marks and any other marks and indica of operation associated
        with the Just Tacos System and remove all trade dress, physical
        characteristics, color combinations and other indications of
        operation under the Just Tacos System from the Premises.
        Without limiting the generality of the foregoing, Franchise
        Owner agrees that it the event of any termination or expiration
        of this Agreement, it will remove all signage bearing the
        Licensed Marks, and, upon Franchisor's request, deliver the
        facia for such signs to Franchisor, and will remove any items

5

which are characteristic of the Just Tacos System "trade dress"
from the Premises.

(Agreement at 7–10, 13–14, 19, 27–28.)  The parties dispute whether this

Agreement was intended to be permanent or temporary.  According to Santoyo,

Zezulak told him that the Agreement would serve to protect both sides in the

interim until a more formal agreement could be entered.  (Santoyo Decl. ¶ 13.)

Defendants, on the other hand, assert that the Agreement was never intended to be

temporary.  ("Dfs. Oppo.," Doc. # 27 ¶ 41.)

In 2010, Zezulak asked Santoyo if the Pearl City Just Tacos Grill

could be converted into a Just Tacos Grill & Cantina.  (Santoyo Decl. ¶ 17.)

Santoyo told him that he had been working on the formal franchise agreement that

they had discussed in 2008 and explained that it would have several terms that

differed from the interim agreement.  (Id.)  According to Santoyo, Zezulak orally

agreed to those terms and Santoyo thus proceeded to handle the construction,

additional vendor relations, and employee training and hiring that was necessary to

turn the Pearl City location into a Just Tacos Grill & Cantina.  (Id.)  Zezulak

disputes that any such oral agreement was made.

Zezulak and Santoyo subsequently entered an agreement to build a

Just Tacos Grill & Cantina in Hawaii Kai, which was to be owned by Zezulak

6

through a new company that he would form.  (Id. ¶ 19; Dfs. Oppo. ¶ 4.)  According

to Defendants, the 2008 Agreement gave Zezulak the right to open other locations

under the same or better terms than set forth in the Pearl City Agreement.

(Santoyo Decl. ¶ 19; Dfs. Oppo. ¶¶ 2–4.)  Zezulak asked Santoyo to handle the

Hawaii Kai build out, hire and train the employees, get the location running, help

put on a grand opening publicity event to take place sometime after the soft

opening, and manage the location's operations.  (Santoyo Decl. ¶ 19.)  Zezulak

agreed to pay Santoyo for these services and Santoyo proceeded to work on these

matters.  (Id.)

In early 2011, Santoyo had his attorney prepare a formal franchise

agreement.  (Id. ¶ 21.)  According to Santoyo, this was the formal agreement that

Zezulak and Santoyo had contemplated in 2008 and it contained the terms to which

Zezulak had orally agreed in 2010.  (Id.)  However, Defendants assert that the

terms of the new franchise agreement were far worse than the terms of the previous

Agreement.  (Dfs. Oppo. ¶ 9.)  Zezulak therefore refused to sign the new

agreement.  (Santoyo Decl. ¶ 21.)

Defendants contend that Plaintiffs threatened that if the new franchise

agreement was not signed by a certain date, then the Hawaii Kai and Pearl City

franchises would be immediately terminated.  (Dfs. Oppo. ¶ 13.)

7

On August 21, 2011, Santoyo received a "Letter of Termination and Ceases and Desist" from Defendants' attorney, Adam Davis, Esq.  That letter states, in part, as follows:

> You are hereby officially terminated as an employee of Franchisee 2. Although your employment with Franchisee 2 was only anticipated to last no longer than one month so that you could help open the Hawaii Kai store[], your services are no longer required. . . .
> You are in material breach of these Licensing Agreements and have failed to cure as requested.  As such, Franchisees will no longer be honoring these Licensing Agreements.  No further "franchise" fees will be paid to you under these Licensing Agreements, which should cause you no real alarm given the fact that you are indebted to Franchisees in an amount that is far greater than [the] monthly fee under these Licensing Agreements.  These fees will be held by my Client, and/or by a Court, if necessary, pending resolution of my Clients' claims.
>
> With regard to the "Just Tacos" brand, the name of the Stores will be changing shortly.  The cost associated therewith will be your responsibility.
>
> . . . .
>
> You are no longer permitted to enter the Stores.  You are no longer permitted to take any action with regard to the Stores.  Should you act in defiance of these positions, action will be immediately taken, including, but not limited to, resort to injunctive relief and criminal prosecution.

(Doc. # 2-15.)

On August 26, 2011, Santoyo received another letter from Davis, stating, in pertinent part, as follows:

8

> [P]lease be advised that we are changing the name of the company and the signage, however, given the situation with the liquor license, the liquor license needs to be transferred in order to assure that our name change doesn't interfere. Are you ready to aid in the proper transfer of the liquor license, or not? We want to have the name[] changed this week as soon as possible, but may need your assistance with the liquor license.

(Doc. # 2-16.)

On September 8, 2011, Plaintiffs' attorney, Milton Yasunaga, Esq.,

wrote Adams a letter, which stated the following:

> In light of the above declarations you made on behalf of Mr. Zezulak and his companies in your August 21 and August 26 letters, and your clients' failure to pay franchise fees and abide by other requirements of their agreements with Mr. Santoyo and his companies, you and your clients are hereby notified that Mr. Santoyo and his companies demand that Mr. Zezulak and his companies immediately – which means well before the planned grand opening of the Hawaii Kai store – cease using the name "Just Tacos", whether in signage, stationery, decor, menus, napkins, uniforms, wrappers, products, advertising, promotion, names, or any other usage, and immediately return my client's menu recipe book(s) and cease using his menu recipes and other proprietary property, and destroy all copies. (Despite your August 21 statement that "with regard to the 'Just Tacos' brand, the name of the stores will be changing shortly," we note that, even as of this afternoon, your clients are still using Mr. Santoyo's trademark/tradename "Just Tacos" – the signage on the Hawaii Kai store still stays "Just Tacos" name for the grand opening . . . )
>
> Mr. Santoyo will cooperate with your client's application to transfer the Pearl City store's liquor license to your client as soon as your client prepares the transfer application.

9

> The two sides have some outstanding payment issues, which they can work together to resolve soon, but that should not delay your clients' stopping the use of the name "Just Tacos" and use of other proprietary things.

(Doc. # 2-18.)

As of October 28, 2011, the Pearl City and Hawaii Kai Just Tacos still had the same Just Tacos food, signage, menus, and Just Tacos trade dress as the Mililani and Ko-Olina locations.  (Santoyo Decl. ¶¶ 18, 22; Docs. ## 2-13, 2-14.)  However, Defendants appear to be in the process of "rebranding" the Pearl City and Hawaii Kai stores and intend to change the name of the stores to "Miguel'z" upon completion of the liquor license forms.  (Dfs. Opp. ¶ 27; Dfs. Appx. at 428–431.)

On October 28, 2011, Plaintiffs JTI and Resol filed a Complaint against Defendants Zezulak, Just Tacos Pearl City, Inc., and Just Tacos Hawaii Kai, Inc. alleging, inter alia, claims for (1) Trademark Infringement, (2) Trade Dress Infringement, (3) Breach of Contract, and (4) Misappropriation of Trade Secrets.  ("Compl.," Doc. # 1.)  On the same day, Plaintiffs also filed the instant Motion for Preliminary Injunction.  ("Mot.," Doc. # 2.)  On November 30, 2011, Defendants submitted a Verified Response in Opposition to the Motion.[1]  (Doc.

---

[1]Due to ECF transmission problems, defense counsel initially submitted Defendants' Opposition to the Court by email.  That Opposition was subsequently filed in the docket by the

# 27.)  On December 5, 2011, Defendants filed a Reply in support of their Motion. (Doc. # 26.)

## STANDARD OF REVIEW

"[I]njunctive relief is an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  Winter v. Natural Res. Def. Council, Inc., 129 S. Ct. 365, 376 (2008).  To obtain a preliminary injunction, the moving party must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Id. at 365 (citing Munaf v. Geren, 128 S. Ct. 2207, 2218–19 (2008); Amoco Prod. Co. v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311–12 (1982)); see also Stormans, Inc. v. Selecky, 586 F.3d. 1109, 1126–27 (9th Cir. 2009) (applying heightened standard mandated by Winter).  "'[S]erious questions going to the merits' and a hardship balance that tips sharply towards the plaintiff can [also] support issuance of an injunction, so long as the plaintiff also shows a likelihood of irreparable injury and that the injunction is in the public interest."  Alliance for Wild Rockies v. Cottrell, 622 F.3d 1045, 1053 (9th Cir. 2010).  A district court has great

---

Clerk's office.  (See Doc. # 27.)

11

discretion in determining whether to grant or to deny a preliminary injunction.  See

Wildwest Inst. v. Bull, 472 F.3d 587, 589–90 (9th Cir. 2006); see also Lopez v.

Heckler, 713 F.2d 1432, 1435 (9th Cir. 1983) ("At one end of the continuum, the

moving party is required to show both a probability of success on the merits and

the possibility of irreparable injury.  At the other end of the continuum, the moving

party must demonstrate that serious legal questions are raised and that the balance

of hardships tips sharply in its favor.") (internal citations omitted).

Plaintiffs seeking preliminary injunctive relief must "demonstrate that

irreparable injury is likely in the absence of an injunction."  Winter, 129 S. Ct. at

375 (emphasis in original).  The mere possibility of irreparable harm is insufficient.

Id. (finding the Ninth Circuit's standard of a "possibility" of harm too lenient).

"To seek injunctive relief, a plaintiff must show that he is under threat of suffering

'injury in fact' that is concrete and particularized; the threat must be actual and

imminent, not conjectural or hypothetical; it must be fairly traceable to the

challenged action of the defendant; and it must be likely that a favorable judicial

decision will prevent or redress the injury."  Summers v. Earth Island Inst., 129 S.

Ct. 1142, 1149 (2009).

If irreparable injury is shown, courts must then "'balance the

competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief.'" Winter, 129 S. Ct. at 376

(quoting Amoco Prod. Co., 480 U.S. at 542).  In assessing whether the plaintiff has

met this burden, the district court has a "'duty . . . to balance the interests of all

parties and weigh the damage to each.'" Stormans, 586 F.3d. at 1138 (quoting

L.A. Mem'l Coliseum Comm'n v. Nat'l Football League, 634 F.2d 1197, 1203 (9th

Cir. 1980)).

Finally, the court must weigh the public interest, if any, implicated by

the injunction. Winter, 129 S. Ct. at 374.  When the reach of an injunction is

narrow, limited only to the parties, and has no impact on nonparties, the public

interest will be "at most a neutral factor in the analysis rather than one that

favor[s][granting or] denying the preliminary injunction." Bernhardt v. Los

Angeles County, 339 F.3d 920, 931 (9th Cir. 2003).  "If, however, the impact of an

injunction reaches beyond the parties, carrying with it a potential for public

consequences, the public interest will be relevant to whether the district court

grants the preliminary injunction." Stormans, 586 F.3d at 1139 (citing

Sammartano v. First Judicial Dist. Court, 303 F.3d 959, 965 (9th Cir. 2002)).

"[When] an injunction is asked [for] which will adversely affect a public interest

. . . the court may in the public interest withhold relief until a final determination of

the rights of the parties, though the postponement may be burdensome to the

plaintiff." <u>Weinberger v. Romero-Barcelo</u>, 456 U.S. 305, 312–13 (1982).  In fact,

"courts . . . should pay particular regard for the public consequences in employing

the extraordinary remedy of injunction." <u>Winter</u>, 129 S. Ct. at 376–77.

DISCUSSION

In their Motion, Plaintiffs seek a preliminary injunction that enjoins

Defendants from using the designations "Just Tacos" and "Just Tacos Mexican

Grill & Cantina," requires them to remove from their stores all elements that make

up the Just Tacos trade dress, and prohibits them from making any representations

to the public that their former franchised businesses are in any way affiliated with

the Just Tacos brand.  Plaintiffs also seek to enjoin Defendants from using or

divulging various Just Tacos trade secrets, recipes, menus, manuals, and financial

information and require them to perform all the post-termination obligations set

forth in the March 2008 Franchise Agreement.

I.    <u>Use of the Just Tacos Trade Name</u>

With respect to the use of the trade name, the Court concludes that

Plaintiffs are entitled to a preliminary injunction enjoining Defendants from using

the "Just Tacos" or "Just Tacos Mexican Grill & Cantina" trade name for the

reasons that follow.

14

A.    <u>Likelihood of Success on the Merits</u>

First, Plaintiffs have demonstrated a likelihood of succeeding on the merits of their trademark infringement claim under the Lanham Act.  15 U.S.C. § 1125(a).  A "trademark" is defined as any combination of words or symbols used in commerce to identify and distinguish one's goods from those manufactured or sold by others and to indicate the source of the goods.  15 U.S.C. § 1127.  "To show trademark infringement, [a plaintiff] 'must demonstrate that it owns a valid mark, and thus a protectable interest,' and it must show that [a defendant's] 'use of the mark is likely to cause confusion, or to cause mistake, or to deceive.'"  <u>Lahoti v. VeriCheck, Inc.</u>, 586 F.3d 1190, 1198 (9th Cir. 2009) (quoting <u>KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.</u>, 408 F.3d 596, 602 (9th Cir. 2005)).

The evidence before the Court demonstrates that Plaintiffs have a valid and protectable interest in the Just Tacos trade name.  Plaintiffs registered the trade name "Just Tacos Mexican Grill & Cantina" with the State of Hawaii.  (Doc. # 2-5.)  The parties do not dispute that since 2005, Plaintiffs have continuously and extensively used the "Just Tacos" mark for its restaurant business and related goods and services.  (Santoyo Decl. ¶ 2.)  Moreover, pursuant to paragraphs 1(b) and 6(a) of the Franchise Agreement, Defendants expressly

15

acknowledge the distinctiveness and value of Just Tacos' trademarks as well as Plaintiffs' rights to those trademarks.

The evidence also makes clear that Defendants continue to use the Just Tacos trademark in a way that is likely to cause confusion.  Defendants have continued to operate under the auspices of being a legitimate Just Tacos franchise even though the franchise relationship has been terminated.  Indeed, "[c]ommon sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks."  4 McCarthy on Trademarks and Unfair Competition § 25:31 (4th ed. 2011) (quoting Burger King Corp. v. Mason, 710 F.2d 1480, 1492 (11th Cir. 1983)).  Thus, a "licensor's case for a preliminary injunction against a holdover dealer or franchisee is stronger than in the ordinary trademark infringement case."  Id. (citing Sunward Electronics, Inc. v. McDonald, 362 F.3d 17, 25 (2nd Cir. 2004) ("There is a compelling need for injunctive relief especially when the case involves a former licensee because, after a license has been revoked, there is an increased danger that consumers will be confused and believe that the former licensee is still an authorized representative of the trademark holder."))  The Court therefore concludes that Defendants' continued and unauthorized use of Just Tacos marks after the termination of the Agreement creates a clear and obvious likelihood of

16

confusion.  Accordingly, Plaintiffs have demonstrated a likelihood of succeeding on the merits of their trademark infringement claims.

In reaching this conclusion, the Court rejects the two arguments advanced by Plaintiffs in their Opposition to the instant motion.  First, they contend that Plaintiffs are the ones who wrongfully terminated the Franchise Agreement and therefore are not entitled to a preliminary injunction.  Second, they assert that the doctrine of unclean hands bars Plaintiffs' Lanham Act infringement claims.

With respect to the first contention, Defendants assert that Plaintiffs engaged in "malicious and intentionally egregious acts amounting to repudiation of the Franchise Agreement."  (Dfs. Opp. ¶ 20.)  However, Plaintiffs have not submitted any evidence to support this assertion.  Moreover, even assuming that Plaintiffs did in fact wrongfully terminate the Agreement, that would not bar the issuance of a preliminary injunction where, as here, the franchisee has stopped performing under the contract.  It is an elementary principle of contract law that:

> [W]hen one party to a contract feels that the other contracting party has breached its agreement, the nonbreaching party may respond to the other party's breach in one of two ways: (1) either stop performance and assume the contract is ended; or (2) continue performance and sue for damages.  Under no circumstances may the nonbreaching party stop performance and continue to take advantage of the contract's benefits.

4 McCarthy on Trademarks and Unfair Competition §25:31 (citing S & R Corp. v. Jiffy Lube Intern., Inc., 968 F.2d 371, 376 (3d Cir. 1992); cf. Constandi v. AAMCO Automatic Transmissions, Inc., 456 F.2d 941, 942 (9th Cir. 1972).  Thus, Defendants' remedy for the alleged wrongful termination of the Agreement by Plaintiffs is money damages, not the continued unauthorized use of the Just Tacos trademark.

Defendants next assert that Plaintiffs threatened to terminate the agreement unless Defendants executed a new franchise agreement and that this threat constitutes inequitable conduct that bars the issuance of an injunction pursuant to the doctrine of unclean hands.  As a preliminary matter, the Court notes that Defendants again have not presented any evidence demonstrating that Plaintiffs made any such threats.  Furthermore, even assuming Plaintiffs had made such threats, that would not constitute grounds for an unclean hands defense to the instant allegations.

The Ninth Circuit has explained that "[t]rademark law's unclean hands defense springs from the rationale that it is essential that the plaintiff should not in his trade mark, or in his advertisements and business, be himself guilty of any false or misleading representation." Perfumebay.com Inc. v. eBay, Inc., 506 F.3d 1165, 1177 (9th Cir. 2007) (citation and internal quotation marks omitted).

18

"To show that a trademark plaintiff's conduct is inequitable, defendant must show that plaintiff used the trademark to deceive consumers." Id. (citation and internal quotation marks omitted).  "Bad intent is the essence of the defense of unclean hands." Id. (citation and internal quotation marks omitted).

Here, Defendants do not allege that Plaintiffs used the Just Tacos trademark to deceive customers, nor does the record demonstrate any such deception.  The fact that Plaintiffs threatened to terminate the agreement does not constitute a false or misleading representation supporting a finding of unclean hands.  Further, Defendants have not demonstrated that Plaintiffs acted with the requisite bad intent.  Accordingly, the Court concludes that Defendants have not shown that Plaintiffs engaged in any inequitable conduct that would support an unclean hands defense.

B.    Irreparable Harm

A plaintiff seeking a preliminary injunction must "demonstrate that irreparable injury is likely in the absence of an injunction." Winter, 129 S. Ct. at 375 (emphasis in original).  In trademark infringement cases, courts have found irreparable harm in the loss of control over a business' reputation and loss of goodwill.  See Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001); Rent-A-Center, Inc. v. Canyon Television and

Applicable Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991); and Maxim Integrated

Products, Inc. v. Quintana, 654 F. Supp. 2d 1024, 1035–36 (N.D. Cal. 2009) (citing

Apple Computer, Inc. v. Formula Int'l. Inc., 725 F.2d 521, 526 (9th Cir. 1984)).

Here, Defendants have persuasively shown that, without the

injunction, they stand to lose control over Just Tacos' reputation.  In particular,

Plaintiffs have submitted evidence indicating that Defendants have deviated from

certain Just Tacos operating practices by, among other things, allowing their

female bartenders to wear revealing outfits on the job and permitting employees on

duty to drink with customers.  (Santoyo Decl. ¶ 33; Docs. ## 2-24, 2-26.)  These

practices serve to compromise efforts to maintain Just Tacos' reputation as a

family-friendly restaurant.  (Santoyo Decl. ¶ 33; Docs. # 2-23.)  Since Defendants

are former franchisees and still have the Just Tacos signage on their stores, it is

likely that customers may mistakenly attribute any practices at Defendants' stores

to the Just Tacos franchise more generally.  Accordingly, the Court concludes that

Plaintiffs will likely suffer irreparable harm to their business reputation absent an

injunction requiring Defendants to cease using the Just Tacos trademark.

C.    Balance of Equities

The Court also determines that the balance of equities tips in Plaintiffs' favor.  As described above, Plaintiffs will likely suffer irreparable harm to their reputation if no injunction is issued.  Meanwhile, although Defendants may be harmed by the issuance of an injunction, they brought on any such difficulties upon themselves by choosing to stop their own performance under the Franchise Agreement.  See 4 McCarthy on Trademarks and Unfair Competition § 30:48 ("'[A] party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchisor of the mark.'") (quoting Pappan Enterprises, Inc. v. Hardee's Food Systems, Inc., 143 F.3d 800, 806 (3rd. Cir. 1998)).  To be sure, to the extent that Defendants claim that Plaintiffs breached the Agreement, they are not prevented from seeking damages for any alleged wrongdoing on the part of Plaintiffs.  However, as discussed above, "[u]nder no circumstances may the nonbreaching party stop performance and continue to take advantage of the contract's benefits."  Id.  (quoting S & R Corp., 968 F.2d at 376).  Since Defendants stopped performing under the Franchise Agreement, they cannot establish a right to continue using the Just Tacos trademark.

21

D.    Public Interest

Lastly, a plaintiff seeking an injunction must establish that the injunction is in the public interest.  In the trademark context, courts have recognized that the public has a valid interest in avoiding confusion as to the source of consumer products and services.  See Internet Specialities West, Inc. v. Milon-DiGiorgio Enterprises, Inc., 559 F.3d 985, 993 (9th Cir. 2009); Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 730 (3d Cir. 2004).  As discussed above, the risk of confusion is heightened where, as here, the infringing party is a former franchisee.  Thus, "the public interest is especially served by issuing a preliminary injunction against a former franchisee as the licensee's status increases the probability of consumer confusion."  Vander Vreken v. American Dairy Queen Corp., 261 F. Supp. 2d 821, 825 (E.D. Mich. 2003).  Additionally, the Ninth Circuit has recognized that the public has an interest in protecting trademarks generally.  Brookfield Communications, Inc. v. West Coast Entertainment Corp., 174 F.3d 1036, 1066 (9th Cir. 1999).  Here, a preliminary injunction would serve the public's interest in both avoiding consumer confusion and protecting trademarks more generally.  The Court thus concludes that this factor weighs in favor of granting an injunction.

22

E.      Preliminary Injunction

Based upon consideration of all the Winter factors set forth above, the Court concludes that Plaintiffs have demonstrated that they are entitled to a preliminary injunction enjoining Defendants from continuing to use the "Just Tacos" trade name.  Defendants are hereby ordered to cease using the "Just Tacos" trade name and remove all signs containing the "Just Tacos" designation by no later than thirty (30) days from the date of this Order.  Based on defense counsel's representations at the hearing, this will provide Defendants sufficient time to file the necessary liquor license forms and change the signs at both the Hawaii Kai and Pearl City locations to reflect the restaurants' new name, "Miguel'z."  Plaintiffs are directed to cooperate with Defendants to get the liquor licenses properly changed and Defendants are directed to report back to the Court regarding their compliance with this Order.

Additionally, during the next thirty days—or until Defendants cease using the "Just Tacos" trade name if that should occur before the thirty days run—Defendants shall take all reasonable steps to maintain the standards of the Just Tacos franchise by operating their stores in a manner consistent with Just Tacos practices.  This includes prohibiting employees from dressing in revealing clothing or drinking with customers while on duty.

23

II.   <u>Further Injunctive Relief</u>

The Court denies without prejudice the balance of Plaintiffs' request in their Motion for Preliminary Injunction.  The parties are directed to meet with Magistrate Judge Kevin S.C. Chang within thirty (30) days from the date of this Order in an effort to reach some mutually agreeable resolution to the instant action. All discovery in this case is stayed until further Order of this Court.

III.   <u>Waiver of Bond Requirement</u>

Federal Rule of Civil Procedure 65(c) provides that "the court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Ninth Circuit has recognized that Rule 65(c) "'invests the district court 'with discretion as to the amount of security required, if any.'"  <u>Johnson v. Couturier</u>, 572 F.3d 1067, 1086 (9th Cir. 2009) (quoting <u>Jorgensen v. Cassiday</u>, 320 F.3d 906, 919 (9th Cir. 2003)) (emphasis in original).

Here, paragraph 19(b) of the Franchise Agreement provides that:

Franchisor or its designee shall be entitled to obtain, <u>without bond</u>, declarations, temporary and permanent injunctions, and orders of specific performance, in order to enforce the provisions of this Agreement relating to Franchise Owner's use of the Licensed Marks, the obligations of Franchise Owner upon termination or expiration of

this Agreement, and assignment of the Franchise and ownership interests in Franchise Owner . . . .

(Doc. # 2-4 at 31 (emphasis added).)  Accordingly, Defendants have plainly waived any bond posting requirement for injunctive relief.

<u>CONCLUSION</u>

For the reasons stated above, the Court **GRANTS IN PART** and **DENIES IN PART WITHOUT PREJUDICE** Plaintiffs' Motion for Preliminary Injunction. (Doc. # 2.)

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, December 9, 2011.

_____
David Alan Ezra
United States District Judge

<u>Just Tacos, Inc., et al. v. Michael Zezulak, et al.</u>, CV No. 11-00663 DAE-KSC; ORDER GRANTING IN PART AND DENYING IN PART WITHOUT PREJUDICE PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION